Filed 9/16/13  P. v. Silva CA4/2

## NOT TO BE PUBLISHED IN OFFICIAL REPORTS

California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.

## IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

## FOURTH APPELLATE DISTRICT

## DIVISION TWO

| | |
|---|---|
| THE PEOPLE, | |
| Plaintiff and Respondent, | E055801 |
| v. | (Super.Ct.No. FVA701548) |
| KEITH SILVA, | OPINION |
| Defendant and Appellant. | |

APPEAL from the Superior Court of San Bernardino County.  Ingrid A. Uhler, Judge.  Affirmed in part; reversed in part with directions.

Cara DeVito, under appointment by the Court of Appeal, for Defendant and Appellant.

Kamala D. Harris, Attorney General, Dane R. Gillette, Chief Assistant Attorney General, Julie L. Garland, Assistant Attorney General, Barry Carlton and Garrett Beaumont, Deputy Attorneys General, for Plaintiff and Respondent.

A jury convicted defendant, Keith Silva, of first degree murder (Pen.Code, § 187, subd. (a))[1] and torture (§ 209), both of which were committed for the benefit of a criminal street gang (§ 186.22, subd. (b)(1)(C)). In connection with the murder, the jury further found that a principal had used a firearm, discharged a firearm and discharged a firearm causing death (§ 12022.53, subds. (b), (c), (d) & (e)(1)). In bifurcated proceedings, defendant admitted having suffered a strike prior. He was sentenced to prison for 75 years to life. He appeals, claiming the trial court erred in refusing to dismiss the jury venire, in denying his motion for a mistrial and in instructing the jury. We reject these contentions and affirm the judgment as it applies to them. The parties agree that our holding in *People v. Beltran* (Aug. 21, 2012, E053541 [nonpub. opn.] (*Beltran*)) constitutes the law of the case and, based on it, we reverse the gang true findings as to both offenses and the firearm true findings as to the murder. We also direct the trial court to correct errors in the abstract of judgment.

## FACTS[2]

"On April 4, 2003, defendant and his codefendant, both members and officers of a local chapter of the Vagos motorcycle club, participated, along with seven other members, in the beating of the victim, a club "hang-around," because the latter owed money to one of the other members and had not returned a truck belonging to yet another. Then, defendant drove the bound victim, along with the codefendant, in his truck out to

---

[1] All further statutory references are to the Penal Code unless otherwise indicated.

[2] On this court's own motion, we have taken judicial notice of the record in *People v. Beltran*, E053541.

the desert where the victim was fatally shot." (*Beltran*, *supra*, E053541, pp. 2-3.)  Facts relating to the gang findings are described in *Beltran*.  (*Id*. at pp. 3-6.)

**ISSUES AND DISCUSSION**

1. *Refusal to Dismiss the Jury Venire*

On the first day of jury selection, a panel of venire persons were brought into the court room and "time qualified" during the morning, and another panel during the afternoon.  The trial court announced to the morning group that the trial would be a "very lengthy" one and to the afternoon group that it would last a month.  The following court day, which was five days later, whatever venire persons survived this process were brought together into the court room and the trial court continued excusing some due to financial hardship or because they had an association with someone who would be testifying in the case.  During this time, one of the venire persons said, "I am a retired parole agent and so is my husband and several other people I know.  I believe [defendant] was at one time on my husband's caseload."  Both counsel immediately stipulated that this venire person could be excused and she was.  The trial court then said, "I'm going to indicate to all of you as jurors—based on [this venire person's] most recent comment, I'm going to tell you right now that [defendant] was not on parole in the State of California and that she's mistaken in terms of her husband being his parole agent.  [¶] Does everybody understand that?  He's not on parole and has not been on parole. Everybody understand that?  Okay."  After excusing another venire person, the court said to the venire, "Because . . . you have to understand that first [the female venire person] thought it was [the codefendant that her husband supervised]—I don't know if you were

3

part of that panel that day—then she goes, 'Oh, now I think it was [defendant].' I think, in all honesty, she's using it as an excuse to get off the jury panel because there's actually no connection between the two at all. [¶] . . . [¶] We kind of expected this. . . . [W]e still have a good core group of people that we are going to get started with. We still hope that we will actually get a panel from those that are willing to remain—and I completely appreciate the fact that all of you are willing to remain and participate in this jury process . . . ." Outside the presence of the venire, counsel for defendant moved to have it dismissed and the process begun all over again because "there is at least a reasonable likelihood that [the female venire person's] comments, despite what the Court told the jurors afterwards, may have poisoned this panel . . . ." The trial court denied the request, saying, "I think I sufficiently admonished the balance of the jury panel and made it very clear that, obviously, [the female venire person's] opinion that there may be a connection between [defendant] and herself was an erroneous one. I think I made it very clear to the jury panel that she made a mistake—and the same mistake with [the codefendant]—and, obviously, I also conveyed my opinion to the other jurors that I thought she was just using it as a tool to try to get off from the jury panel because from the beginning we met her, she was giving all sorts of excuses trying to get off the jury panel despite our efforts of having her remain as a potential juror, so I think with the admonishment provided by the Court to the other potential jurors, that that, obviously, deadens any type of potential prejudice with the other jurors. They all agreed in unison that they accepted the Court's admonition and that, obviously, we're under the legal authority to expect and understand that the jurors do follow court admonitions . . . ." Defendant points out that because the

4

record states that he was convicted of voluntary manslaughter for the 1988 killing of his wife the trial court lied to the venire when it said that defendant had never been on parole.

Also during trial, defense counsel objected to the introduction into evidence of pictures of defendant's tattoos that he received in prison. One was of an eagle and the other was of the letters, "I" and "E." Counsel asserted that since two of the jurors were employees of the Department of Corrections (one was retired but had worked at "Calpatria State Prison, two fire camps" and Patton State Hospital, the latter for 13 years, and the other currently worked at Patton) "they . . . have to receive certain training and have experience vis-à-vis . . . prison tattoos and what they mean, . . . since the [c]ourt had instructed the panel early on that [defendant] was not in prison, my concern is that those jurors . . . could identify those as prison tattoos." The prosecutor pointed out that the People's expert, who would be testifying about defendant's tattoos, would not say that they were prison tattoos. The prosecutor added that the People's expert told him that he had seen tattoos identical to both of defendant's on a lot of people who had not been to prison. The court added that it, too, had seen "all the time" "I" and "E" tattoos on people "not necessarily . . . placed in prison" and that this had occurred in the presence of jurors who had Department of Corrections backgrounds. The trial court ruled that the photographs would be admitted, saying, "[B]ased on my experience in handling a lot of gang trials in the past, . . . I don't think there's anything unique to these tattoos that show any type of affiliation to the prison system. I.E. has been testified to in terms of chapters in the Inland Valley Empire, so that could be testified to by the expert indicating that that's not [an] unusual type of tattooing for people that associate with the Inland Valley

5

Empire Vagos gang, and an eagle, which doesn't show any indications of a particular uniqueness of the eagle that would only be tattooed in the prison system. [¶] So if [defendant] did . . . get those tattoos in the prison system, so be it, but I don't think there's anything unique about those tattoos so that any juror, even those that are associated by way of employment with the Department of Corrections, will recognize those tattoos are from the state prison system."

Defendant concedes that the trial court's denial of his request to have the venire dismissed should be reversed only upon a clear showing of abuse of discretion. (*People v. Medina* (1990) 51 Cal.3d 870, 889.) It is important to note, as neither party here does, that whatever discussion occurred between this venire person and the trial court before the latter stated her belief that defendant was her husband's charge *did not* occur on the record before this court. Therefore, we must assume that it took place out of the hearing of the other venire persons. Thus, when the trial court represented to the other potential jurors that this venire person had previously said that it was the codefendant whom her husband had supervised on parole, then changed her mind and said it was defendant, that she was using it as an excuse to try to get out of jury service and "we kind of expected" her to say such a thing, the rest of the venire had no reason to doubt the court's representations because these things had not taken place in their presence. Thus, this case is entirely different on its facts from *Mach v. Stewart* (9th Cir. 1997) 137 F.3d 630 (*Mach*), which defendant cites in support of his argument.

In *Mach*, the defendant was charged with sexual conduct with a minor. (*Mach*, *supra*, 137 F.3d at p. 631.) A prospective juror was a social worker for Child Protective

6

Services.  (*Id*. at p. 632.)  In the presence of the entire venire, "the trial judge elicited from [her] . . . that she had a certain amount of expertise in this area (she had taken child psychology courses and worked with psychologists and psychiatrists [and] she [had] worked with children as a social worker for the state for at least three years); and . . . [she made] four separate statements that she had *never* been involved in a case in which a child accused an adult of sexual abuse where that child's statements had not been borne out.  While the court did warn [this potential juror] and the [other venire persons] that jurors are to make determinations based on evidence rather than on their own experiences or feelings, it went on to elicit yet another statement from [the potential juror] that she had never known a child to lie about sexual abuse.  The court asked the other [venire persons] whether anyone disagreed with her statement, and no one responded.  [¶] . . . [¶] . . . Given the nature of [the potential juror's] statements, the certainty with which they were delivered, the years of experience that led to them, and the number of times that they were repeated, we presume that at least one juror was tainted and entered into jury deliberations with the conviction that children simply never lie about being sexually abused." (*Id*. at p. 633.)

Comparing the facts in *Mach* to those here leaves little room for disagreement that the holding in *Mach* has no application whatsoever to this case.  The female venire person's statement here was made once—not four times, as in *Mach*.  It was immediately and powerfully called into question by the trial court, based on information of which the venire was unaware, giving the trial court more than an unfair advantage in the credibility contest between it and the venire person.  The admission of the pictures of defendant's

7

tattoos did not change this. As the trial court observed, and as has been the experience of this court, I.E. tattoos are exceedingly common in this area and neither it nor the eagle tattoo are suggestive of prison, even to an employee of the Department of Corrections. With the popularity of tattoos, there are a plethora of unprofessional tattoos being inflicted on the general public. Moreover, the jury had been repeatedly instructed not to consider anything but the evidence presented and it must be assumed that they followed this directive. (*People v. Carey* (2007) 41 Cal.4th 109, 130.)

For the same reason, we reject defendant's assertion that the trial court abused its discretion in failing to ask each potential juror if he or she had been affected by the offending remark of the female venire person.[3] Moreover, as the People correctly point out, by not requesting such an examination, defendant waived whatever error the trial court committed by failing to question each potential juror. (*People v. Ramos* (2004) 34 Cal.4th 494, 515.)

Equally unhelpful is another federal case to which defendant draws our attention, *Paschal v. United States* (5th Cir. 1962) 306 F.2d 398. In *Paschal*, the defendant was charged with passing counterfeit $20 bills, and he claimed that he did not know the money was counterfeit when he used it to buy items. (*Id*. at p. 399.) He claimed he could have gotten the bills from a bank in his home state or when he played dice in the

---

[3] Defendant appears to backtrack from this claim in his reply brief, asserting that his only assignment of error was the trial court's failure to dismiss the venire. However, both this court and the People have been left with the impression that defendant also challenged the trial court's failure to question each venire person, due to defendant's mention of it several times in his opening brief and his citations to cases dealing with such a situation.

state where he passed the bills. (*Id*. at p. 399.) A stockholder and director of a local bank who was a potential juror said, in the presence of his fellow venire persons, that his bank had gotten "[s]ome Paschal money"—"[t]his defendant's money" three years previously. (*Ibid*.) Although this potential juror was excused from the jury, the circuit court concluded, "It is difficult to see how a remark could be more prejudicial. When . . . [a potential juror] comes forward with the conclusion of guilt based upon some special information or knowledge he has gained, in this case because [he] was a stockholder and director of a bank, the influence on the minds of the other [prospective] jurors is inevitable. *Such statements appear in the guise of the real truth*. . . . [N]either judge nor counsel . . . could effectively eradicate the impact of such an occurrence. . . . Nothing could undo what his words had done." (*Id*. at p. 400, italics added.) Here, in contrast, there was no "guise of truth" for the statement made by the female venire person—just the opposite. The trial court told the jury that she was mistaken and explained why she said what she said.

2. *Denial of Motion for Mistrial*

On the fifth day of jury deliberations, defendant's attorney, inter alia, moved to dismiss from the jury juror number nine on the ground that she had withheld information during voir dire. Despite being asked by the trial court if she had ever been a victim or a witness to a crime, she had failed during jury selection to disclose that in December 2008, when she was six months pregnant with her boyfriend's child, she had been threatened, then assaulted by her boyfriend's estranged wife, against whom she had obtained a restraining order the previous September. During the December incident, the wife

9

entered the home of juror number nine and beat the latter using a walker and stomped on her stomach. Juror number nine was taken to the hospital, out of an abundance of caution, and she initially told law enforcement that she wanted to prosecute her assailant, whom she could identify. She then obtained a second restraining order against the wife due to this incident. Either the assault or the wife's violation of the original restraining order was prosecuted as a misdemeanor and the wife was placed in a work release program for 30 days. The prosecutor feared that juror number nine was aware of the outcome of the case and was upset with his office due to its lenient treatment of the wife. The trial court concluded that juror number nine had intentionally concealed material facts, which resulted in prejudice to defendant, the codefendant and the People. The court granted the motion of all three parties to dismiss this juror, but denied the codefendant's motion to declare a mistrial. The codefendant had argued that a mistrial was appropriate because juror number nine had participated in days of deliberations and "the way that she's handled herself in the jury deliberation room is going to contaminate" the other jurors. The trial court rejected this notion, concluding that the instruction it intended to give to the newly constituted jury that the latter was to begin deliberations afresh and ignore whatever had been said or done in the deliberation room previously was sufficient.

Defendant here asserts that the trial court erred in denying the codefendant's motion for mistrial. However, defendant waived the error by failing to join in that

10

motion. (*People v. Burgener* (2003) 29 Cal.4th 833, 867, 869.)[4] Moreover, defendant is incorrect on the merits of the trial court's ruling.

Defendant contends that the trial court abused its discretion, i.e., that his chance of receiving a fair trial had been damaged and cannot be repaired by direction due to the concealment of information by juror number nine. (*People v. Wallace* (2008) 44 Cal.4th 1032, 1068; *People v. Ayala* (2000) 23 Cal.4th 225, 282.) However, defendant concedes that we must assume that the jury followed the court's directive and only in exceptional cases is the subject matter of the undisclosed information such that its effect cannot be

---

[4] Defendant misreads the record by asserting that "the [trial] court clearly understood that both defendants were in agreement on th[e] motion [for mistrial]" and "even though [defendant] did not expressly join th[e] motion [to dismiss juror number nine] the [trial] court nevertheless deemed [defendant] to have done so." At the beginning of the hearing on this matter, the trial court said, "[Counsel for defendant] said that he was going to likely join in [the] request [by counsel for the codefendant] that Juror No. 9 be excused for juror misconduct . . . ." After explaining his reasons for requesting the dismissal of this juror, counsel for the codefendant said, "And I'd be moving for a mistrial" and he went on to explain his reason for doing so. He concluded by saying that, in the alternative, he asked that juror number nine be dismissed, that an alternate be seated and that deliberations begin anew. After the trial court reviewed some of the facts pertinent to what had occurred, it invited counsel for defendant to speak. Counsel mentioned facts that undermined juror number nine's previous claim that the 2008 incident was "no big deal" and he questioned her basis for remaining silent when asked if she had been the victim of a crime. The prosecutor then chimed in with his own reasons for dismissing juror number nine. The trial court then said, "I do agree with *all three parties* that . . . it was an intentional concealment of a material fact [that] has resulted in prejudice to *all parties* . . . I concur with *all three parties* and I am going to grant the request of [counsel for the codefendant], *that's joined by* both [*counsel for defendant*] and [the prosecutor], that . . . juror . . . No. 9 be excused for . . . misconduct . . . , and that her . . . conceal[ment] . . . has resulted in prejudice to *all the parties* involved in this case. [¶] . . . [¶] Your motion for mistrial, [*counsel for the codefendant*], . . . I'm going to deny. . . . I don't believe that a mistrial is warranted . . . and *your* request for a mistrial is denied . . . ." Only counsel for the codefendant responded to these remarks by the trial court.

11

overcome by admonishment. (*People v. Avila* (2006) 38 Cal.4th 491, 574; *People v. Allen* (1978) 77 Cal.App.3d 924, 934, 935.) Defendant's reasoning for asserting that this is such an exceptional case is as follows: "[Had Juror No.9 been forthcoming,] there would at least have been further questions asked of her, which in turn would have affected either side's use of either challenges for cause or peremptory challenges, and by extension it would have affected the entire composition of the rest of the jury." As proof of this assertion, defendant references the argument made to the trial court by the codefendant in support of his motion for mistrial that "knowledge of Juror [No.] 9's status as a victim . . . 'would have had a very strong affect on the decision-making on the part of [the codefendant] as to whether to exclude or include that juror or to ask to have her removed either for cause or for challenge . . . .'" Of course, it goes without saying that the exclusion of juror number nine because she had been a victim would have affected the composition of the jury because she would not have been part of it—and that is precisely what eventually happened. The reality is, however, that the prosecutor would have challenged juror number nine either for cause or peremptorily and gotten rid of her, which, again, is exactly what happened. This circular reasoning does not make this case the exceptional one in which direction from the trial court could not cure whatever damage was done by the withholding of information. Even the codefendant's assertion below, i.e., that juror number nine somehow infected the other jurors by "the way she handled herself" in the deliberation room, was based on pure speculation and ignores the presumption defendant concedes we must honor that the reconstituted jury observed the

12

court's directive by beginning deliberations anew and ignoring whatever was said or done previously in the deliberation room.

Next, defendant asserts that the record demonstrates a substantial likelihood that one or more jurors was actually prejudiced against defendant (*In re Hamilton* (1999) 20 Cal.4th 273, 296) because before juror number nine was dismissed, the jury deliberated three full days and a little over three hours without reaching verdicts, but was able to reach verdicts in about three hours after being reconstituted. All this suggests is that juror number nine was not of one mind with the jurors, and her removal from the jury allowed the others, who were convinced of the guilt of both defendants, to proceed unencumbered. Certainly, earlier complaints about juror number nine by other jurors that she was not focusing on the evidence actually introduced at trial and that she was disagreeing with them bore this out.

3. *Jury Instruction on Motive*

The jury was instructed that, inter alia, the charged torture, "require[s] proof of the union or joint operation of act and wrongful intent. [¶] For you to find [defendant] guilty of th[is] crime . . . , [defendant] must not only intentionally commit the prohibited act but must do so with a specific intent and/or mental state. The act and the specific intent and/or mental state required are explained in the instruction for that crime." The jury was further instructed, "To prove that the defendant is guilty of [torture], the People must prove that: [¶] 1. The defendant inflicted great bodily injury on someone else; and, [¶] 2. When inflicting the injury, the defendant intended to cause cruel and extreme pain and suffering for the purpose of revenge, extortion, persuasion, or for any sadistic purpose."

13

Finally, the jury was instructed, pursuant to the standard instruction on motive, "The People are not required to prove that the defendant had a motive to commit the crime charged. In reaching your verdict you may, however, consider whether the defendant had a motive. [¶] Having a motive may be a factor tending to show that the defendant is guilty. Not having a motive may be a factor tending to show the defendant is not guilty."

The prosecutor argued to the jury concerning this torture, "I have to prove two things, and those are the two things: [¶] [First, i]nfliction of great bodily injury. . . . [¶] [Second], when the injury is inflicted, the person intends to cause cruel or extreme pain and suffering for the purpose of revenge or persuasion." The prosecutor went on to argue the facts that he asserted proved this. He did not mention the standard jury instruction on motive.

Counsel for defendant, however, did. He said, in discussing the murder charge, "The judge has also instructed you that motive is not an element of the crime, and it's not. . . . [W]e've seen enough motiveless crimes out there to know that motive is not an element of the crime, but we also know that the presence of some sort of motive may indicate guilt, the absence of some sort of motive may show innocence. In this case motive to kill [the victim] that goes beyond some sort of a beating belongs to others. It belongs to a lot . . . of people, but it does not belong to [the defendant and the codefendant]." As to the torture charge, counsel for defendant argued that there was insufficient evidence that defendant either participated in the beating of the victim or encouraged whoever beat the victim to do so. He made no argument about defendant's intent or motive as to that crime.

14

Defendant here asserts that the standard instruction on motive caused the jury to conclude that it was not, contrary to the other instructions mentioned above, required to find beyond a reasonable doubt that he had the requisite intent for torture in order to convict him of that crime and the failure of the trial court, sua sponte, to inform the jury that the instruction on motive was inapplicable to torture requires reversal of that conviction.[5] We disagree.

Rather than take sides in the scuffle between the People and defendant over whether defendant's silence below constituted a waiver of the issue, we address its merits. The question to be decided is whether it is reasonably likely that, based on the presence of the standard instruction on motive, the jury believed it did not have to find beyond a reasonable doubt that defendant had the requisite intent for torture. (See *People v. Huggins* (2006) 38 Cal.4th 175, 192; *People v. Frye* (1998) 18 Cal.4th 894, 957 [disproved on other grounds in *People v. Doolin* (2009) 45 Cal.4th 390, 421, fn. 22].) When considered with the argument of counsel (*Middleton v. McNeil* (2004) 541 U.S. 433, 434-438; *People v. Gonzales* (2011) 51 Cal.4th 894, 939) we conclude that there is no such likelihood.

As the People point out, *People v. Hamlin* (2009) 170 Cal.App.4th 1412, 1452, held that "because motive is not an element of the crime of torture, the trial court did not err in instructing the jury with [the standard instruction on motive]." The holding cited

---

[5] Because we reverse the gang enhancements for another reason, we need not address defendant's contention that the failure of the trial court to inform the jury that the instruction on motive was equally inapplicable to these enhancements requires reversal of them, as well.

15

an identical one in *People v. Lynn* (1984) 159 Cal.App.3d 715 [Fourth Dist, Div. One], concerning the crime of first degree murder by torture, which holding was later approved by the California Supreme Court in *People v. Whisenhunt* (2008) 44 Cal.4th 174, 218 based on its earlier conclusion in *People v. Hillhouse* (2002) 27 Cal.4th 469, 503, 504 (*Hillhouse*), that "'although malice and certain intents and purposes are elements of the [charged] crimes, . . . *motive* is not an element.' [Citation.] '*Motive describes the reason a person chooses to commit a crime. The reason, however, is different from a required mental state such as intent or malice.*' [Citation.]" (*Hillhouse* at pp. 503-504, italics added.)[6] While *Whisenhunt* and *Hillhouse* bind us (*Auto Equity Sales, Inc. v. Superior Court* (1962) 57 Cal.2d 450), because defendant argues that the jury was misled by the presence of the standard instruction on motive, we have addressed the issue as we have.

4. *Gang Enhancements*

The parties agree that our holding in the codefendant's appeal, *Beltran, supra*, E053541, that there was insufficient evidence that the Vagos had, as one of more of their primary activities, the commission of "'assault with a deadly weapon or by means likely to produce great bodily injury, robbery, murder/manslaughter, the sale or possession for sale, transportation of controlled substances, and/or sale, delivery, or transfer of firearms'" (*id*. at pp. 6-7) is law of the case and requires reversal of the true findings as to

---

[6] In so doing, the California Supreme Court distinguished the one case defendant cites in support of his position, *People v. Maurer* (1995) 32 Cal.App.4th 1121, concluding that the misdemeanor offense of child annoyance addressed therein "is a strange beast" in that "it *did* have motive as an element—an unnatural or abnormal sexual interest." (*Hillhouse*, *supra*, 27 Cal.4th at p. 504.)

16

the street gang allegations for both crimes and the firearm allegations for the murder, which are all dependent on the conclusion that the murder was committed to benefit a street gang. Therefore, we will reverse those true findings.

## DISPOSITION

The true findings under sections 186.22, subdivision (b) and 12022.53, subdivisions (b), (c), (d) and (e)(1) are reversed, as are the sentences imposed for them. If the People elect not to retry defendant for these enhancements, or if the trial court determines retrial is barred, the trial court is directed to impose a one year enhancement pursuant to section 12022, subdivision (a)(1) as to the murder and to note this in an amended abstract of judgment and court minutes. In either event, the trial court is further directed to indicate 1) on the first page of the abstract of judgment, that the 14-years-to-life term for torture (count 2) is a concurrent term, 2) in section nine of the abstract, that a $1,000 state restitution fine, pursuant to section 1202.4, subdivision (b), and a $1,000 parole revocation fine, pursuant to section 1202.45, were imposed, and 3) in section 9(b) of the abstract, that a $40 court security fee, under section 1465.8, subdivision (a)(1), and a $30 criminal conviction assessment, under Government Code section 70373, subdivision (a)(1), were imposed for each of the two convictions. In all other respects, the judgment is affirmed.

RAMIREZ, P. J.


We concur:

KING, J.
CODRINGTON, J.

17